**John DOE and Richard Smith, Plaintiffs–Appellees,**

v.

**MUTUAL OF OMAHA INSURANCE COMPANY, Defendant–Appellant.**

No. 98–4112.

United States Court of Appeals, Seventh Circuit.

Argued April 5, 1999.

Decided June 2, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 3, 1999.*

* Hon. Joel M. Flaum, Hon. Kenneth F. Ripple, Hon. Ilana Diamond Rovner, Hon. Diane P. Wood and Hon. Terence T. Evans voted to grant the petition for rehearing en banc.

Stuart I. Graff, Schiff, Hardin & Waite, Heather C. Sawyer (argued), Ann H. Fisher, Chicago, IL, for Plaintiffs–Appellees.

Joel H. Kaplan (argued), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendant–Appellant.

Ann Elizabeth Reesman, McGuiness & Williams, Washington, DC, for Equal Employment Advisory Council.

Daniel Bruner, Whitman–Walker Clinic Legal Services, Washington, DC, for Infectious Diseases Society of America, Nat'l Assoc. of Public Hospitals & Health Services, HIV Managed Care Network, American Public Health Assoc., and the AIDS Foundation of Chicago.

Roger Leishman, Roger Baldwin Foundation of ACLU, Inc., Chicago, IL, for American Civil Liberties Union Foundation, American Civil Liberties Union of Illinois, National Association of Protection and Advocacy Systems, Disability Rights Education and Defense Fund, Inc. and Equip for Equality.

Jessica Dunsay Silver, Department of Justice, Civil Rights Division, Appellate Section, Washington, DC, for United States Department of Justice.

Chai R. Feldblum, Georgetown University Law Center, Washington, DC, for AIDS Action Council.

Before POSNER, Chief Judge, and EASTERBROOK and EVANS, Circuit Judges.

POSNER, Chief Judge.

■ Mutual of Omaha appeals from a judgment that the AIDS caps in two of its health insurance policies violate the public accommodations provision of the Americans with Disabilities Act. One policy limits lifetime benefits for AIDS or AIDS-related conditions (ARC) to $25,000, the other limits them to $100,000, while for other conditions the limit in both policies is $1 million. Mutual of Omaha has stipulated that it "has not shown and cannot show that its AIDS Caps are or ever have been consistent with sound actuarial principles, actual or reasonably anticipated experience, bona fide risk classification, or state law." It also concedes that AIDS is a disabling condition within the meaning of the Americans with Disabilities Act. See *Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 2207–09, 141 L.Ed.2d 540 (1998); *Doe v. Dekalb County School District*, 145 F.3d 1441, 1445 n. 5 (11th Cir.1998). Since the Supreme Court held in *Bragdon* that infection with the AIDS virus (HIV) is a disabling condition from the onset of the infection, 118 S.Ct. at 2204, before any symptoms appear, it is apparent that both ARC and AIDS are disabilities. Mutual of Omaha does not question this, but argues only that the Americans with Disabilities Act does not regulate the content of insurance policies.

Title III of the Act, in section 302(a), provides that "no individual shall be discriminated against on the basis of disabili-

ty in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation" by the owner, lessee, or operator of such a place. 42 U.S.C. § 12182(a). The core meaning of this provision, plainly enough, is that the owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, Web site, or other facility (whether in physical space or in electronic space, *Carparts Distribution Center, Inc. v. Automotive Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 19 (1st Cir.1994)) that is open to the public cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do. The owner or operator of, say, a camera store can neither bar the door to the disabled nor let them in but then refuse to sell its cameras to them on the same terms as to other customers. E.g., *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052 (5th Cir.1997); *Paralyzed Veterans of America v. D.C. Arena L.P.*, 117 F.3d 579 (D.C.Cir. 1997); Department of Justice, Civil Rights Division, *The Americans with Disabilities Act: Title III Technical Assistance Manual* § III–3.2000 (Nov.1993); 28 C.F.R. § 36.202. To come closer to home, a dentist cannot refuse to fill a cavity of a person with AIDS unless he demonstrates a direct threat to safety or health, *Bragdon v. Abbott, supra*, 118 S.Ct. at 2210–13; *Koshinski v. Decatur Foundry, Inc.*, 177 F.3d 599 (7th Cir.1999), and an insurance company cannot (at least without pleading a special defense, discussed below) refuse to sell an insurance policy to a person with AIDS. 28 C.F.R. § 36.104 Place of Public Accommodation (6). Mutual of Omaha does not refuse to sell insurance policies to such persons—it was happy to sell health insurance policies to the two plaintiffs. But because of the AIDS caps, the policies have less value to persons with AIDS than they would have to persons with other, equally expensive diseases or disabilities. This does not make the offer to sell illusory, for people with AIDS have medical needs unrelated to AIDS, and the policies give such people as much coverage for those needs as the policies give people who don't have AIDS. If all the medical needs of people with AIDS were AIDS-related and thus excluded by the policies, this might support an inference that Mutual of Omaha was trying to exclude such people, and such exclusion, as we shall see, might violate the Act. But that is not argued.

Since most health-insurance policies contain caps, the position urged by the plaintiffs would discriminate among diseases. Diseases that happened to be classified as disabilities could not be capped, but equally or more serious diseases that are generally not disabling, such as heart disease, could be. Moreover, the plaintiffs acknowledge the right of an insurance company to exclude coverage for an applicant's pre-existing medical conditions. If the applicant is already HIV-positive when he applies for a health-insurance policy, the insurer can in effect cap his AIDS-related coverage at $0. This "discrimination" is not limited to AIDS or for that matter to disabilities, which is why the plaintiffs do not challenge it; but it suggests that the rule for which they contend is at once arbitrary and unlikely to do much for people with AIDS.

The insurance company asks us to compare this case to one in which a person with one leg complains of a shoestore's refusal to sell shoes other than by the pair, or in which a blind person complains of a bookstore's refusal to stock books printed in Braille. We do not understand the plaintiffs to be contending that such complaints are actionable under section 302(a), even though there is a sense in which the disabled individual would be denied the full and equal enjoyment of the services that the store offers. In fact, it is apparent that a store is not required to alter its inventory in order to stock goods such as Braille books that are especially designed for disabled people. *Lenox v. Healthwise of Kentucky, Ltd.*, 149 F.3d 453, 457 (6th Cir.1998); 28 C.F.R. § 36.307. But it is

apparent as a matter of interpretation rather than compelled by a simple reading which would place the present case on the other side of the line; and so the case cannot be resolved by reference simply to the language of section 302(a).

The common sense of the statute is that the content of the goods or services offered by a place of public accommodation is not regulated. A camera store may not refuse to sell cameras to a disabled person, but it is not required to stock cameras specially designed for such persons. Had Congress purposed to impose so enormous a burden on the retail sector of the economy and so vast a supervisory responsibility on the federal courts, we think it would have made its intention clearer and would at least have imposed some standards. It is hardly a feasible judicial function to decide whether shoestores should sell single shoes to one-legged persons and if so at what price, or how many Braille books the Borders or Barnes and Noble bookstore chains should stock in each of their stores. There are defenses to a prima facie case of public-accommodation discrimination, but they would do little to alleviate the judicial burden of making standardless decisions about the composition of retail inventories. The only defense that might apply to the Braille case or the pair of shoes case is that the modification of a seller's existing practices that is necessary to provide equal access to the disabled "would fundamentally alter the nature of ... [the seller's] services," 42 U.S.C. § 12182(b)(2)(A)(ii), and it probably would not apply to either case and certainly not to the Braille one.

The plaintiffs might be able to distinguish the shoestore hypothetical by pointing out that a nondisabled person might be in the market for one shoe simply because he had lost a shoe; in refusing to sell single shoes the store thus would not be refusing to adapt its service to a class of customers limited to disabled people. But the Braille case, and many others that we can imagine (such as a furniture store's decision not to stock wheelchairs, or a psychiatrist's refusal to treat schizophrenia, as distinct from his refusing to treat schizophrenics for the psychiatric disorders in which he specializes, or a movie theater's refusal to provide a running translation into sign language of the movie's soundtrack), cannot be so distinguished, although some of them might find shelter in the "fundamental alteration" defense. All are cases of refusing to configure a service to make it as valuable to a disabled as to a nondisabled customer.

That the plaintiffs are asking that a limitation be removed rather than that a physical product be added or altered cannot distinguish these cases. For the same thing is true in our example of the psychiatrist who refuses to treat schizophrenia. More important, since section 302(a) is not limited to physical products, but includes contracts and other intangibles, such as an insurance policy, a limitation upon the duty to serve cannot be confined to physical changes. An insurance policy is a product, and a policy with a $25,000 limit is a different product from one with a $1 million limit, just as a wheelchair is a different product from an armchair. A furniture store that does not stock wheelchairs knows that it is making its services less valuable to disabled than to nondisabled people, but the Americans with Disabilities Act has not been understood to require furniture stores to stock wheelchairs.

It might seem that the AIDS caps could be distinguished from the "refusal to stock" cases because the caps include complications of AIDS. If being infected by HIV leads one to contract pneumonia, the cost of treating the pneumonia is subject to the AIDS cap; if a person not infected by HIV contracts pneumonia, the costs of treating his pneumonia are fully covered. It looks, therefore, like a difference in treatment referable solely to the fact that one person is disabled and the other not.

But this is not correct. The essential point to understand is that HIV doesn't cause illness directly. What it does is

weaken and eventually destroy the body's immune system. As the immune system falters, the body becomes prey to diseases that the system protects us against. These "opportunistic" diseases that HIV allows, as it were, to ravage the body are exotic cancers and rare forms of pneumonia and other infectious diseases. Anthony S. Fauci & H. Clifford Lane, "Human Immunodeficiency Virus (HIV) Disease: AIDS and Related Disorders," in 2 *Harrison's Principles of Internal Medicine* 1791, 1824–45 (Anthony S. Fauci et al. eds., 14th ed.1998). To refer to them as "complications" of HIV or AIDS is not incorrect, but it is misleading, because they are the chief worry of anyone who has the misfortune to be afflicted with AIDS. An AIDS cap would be meaningless if it excluded the opportunistic diseases that are the most harmful consequences of being infected by the AIDS virus.

What the AIDS caps in the challenged insurance policies cover, therefore, is the cost of fighting the AIDS virus itself and trying to keep the immune system intact plus the cost of treating the opportunistic diseases to which the body becomes prey when the immune system has eroded to the point at which one is classified as having AIDS. The principal opportunistic diseases of AIDS, such as Kaposi's sarcoma, *Pneumocystis carinii* pneumonia, AIDS wasting, and esophageal candidiasis, are rarely encountered among people who are not infected by HIV—so rarely as to be described frequently as "AIDS-defining opportunistic infections." *Id.* at 1818. The frequency of *Pneumocystis carinii* pneumonia, for example, "among patients infected with human immunodeficiency virus (HIV) far exceeds that among other immuno-compromised hosts" and is "a leading cause of opportunistic infection and death among AIDS patients in industrialized countries." Peter D. Walzer, "*Pneumocystis Carinii* Infection," in 1 Harrison's, *supra*, at 1161. It is these *distinctive* diseases that are the target (along with the costs of directly treating infection by HIV) of the AIDS caps. This is not a case of refusing, for example, to provide the same coverage for a broken leg, or other afflictions not peculiar to people with AIDS, to such people, which would be a good example of discrimination by reason of disability.

It is true that as the immune system collapses because of infection by HIV, the patient becomes subject to opportunistic infection not only by the distinctive AIDS-defining diseases but also by a host of diseases to which people not infected with HIV are subject. Even when they are the same disease, however, they are far more lethal when they hit a person who does not have an immune system to fight back with. Which means they are not *really* the same disease. This is not a point that is peculiar to AIDS. The end stage of many diseases is an illness different from the one that brought the patient to that stage; nowadays when a person dies of pneumonia, it is usually because his body has been gravely weakened by some other ailment. If a health insurance policy that excluded coverage for cancer was interpreted not to cover the pneumonia that killed a patient terminally ill with cancer, this would not be "discrimination" against cancer.

To summarize the discussion to this point, we cannot find anything in the Americans with Disabilities Act or its background, or the nature of AIDS and AIDS caps, to justify so radically expansive an interpretation as would be required to bring these cases under section 302(a) without making an unprincipled distinction between AIDS caps and other product alterations—unless it is section 501(c)(1) of the Act. That section provides that Title I (employment discrimination against the disabled) and Title III (public accommodations, the title involved in this case) "shall not be construed to prohibit or restrict an insurer . . . from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law," 42 U.S.C. § 12201(c)(1), unless the prohibition or restriction is "a subter-

fuge to evade the purposes" of either title. § 12201(c). Even with the "subterfuge" qualification, section 501(c) is obviously intended for the benefit of insurance companies rather than plaintiffs and it may seem odd therefore to find the plaintiffs placing such heavy weight on what is in effect a defense to liability. But a defense can cast light on what is to be defended against, that is, what the prima facie case of a violation is. Suppose, for example, that a statute regulated the sale of "animals" but it was unclear whether the legislature had meant to include fish. Were there a statutory exclusion for goldfish, it would be pretty clear that "animals" included fish, since otherwise there would be no occasion for such an exclusion. And, with that clarified, the advocate of regulating the sale of a particular goldfish would have to show only that the exclusion was somehow inapplicable to him. That is the plaintiffs' strategy here. They use the insurance provision to show that section 302(a) regulates content, then argue that the excluding provision is narrow enough to allow them to challenge the coverage limits in Mutual of Omaha's policies. There is even some legislative history, which the plaintiffs hopefully call "definitive," to section 501(c) that suggests that an insurance company can limit coverage on the basis of a disability only if the limitation is based either on claims experience or on sound actuarial methods for classifying risks. H.R.Rep. No. 485, 101st Cong., 2d Sess. 136–37 (1990); S.Rep. No. 116, 101st Cong., 1st Sess. 84–86 (1989). And Mutual of Omaha conceded itself out of relying on section 501(c)'s safe harbor by stipulating that it cannot show that its AIDS caps are based on sound actuarial principles or claims experience or are consistent with state law.

The plaintiffs argue, consistent with our goldfish example, that the insurance exemption has no function if section 302(a) does not regulate the content of insurance policies, and so we should infer that the section does regulate that content. But this reasoning is not correct. If it were, it would imply that section 302(a) regulates the content not only of insurance policies but also of all other products and services, since the section is not limited to insurance. The insurance industry may have worried that the section would be given just the expansive interpretation that the district court gave it in this case, and so the industry may have obtained the rule of construction in section 501(c) just to backstop its argument that section 302(a) regulates only access and not content. Or it may have worried about being sued under section 302(a) for refusing to sell an insurance policy to a disabled person. Remember that the right of full and equal enjoyment as we interpret it includes the right to buy on equal terms and not just the right to enter the store. For Mutual of Omaha to take the position that people with AIDS are so unhealthy that it won't sell them health insurance would be a prima facie violation of section 302(a). But the insurance company just might be able to steer into the safe harbor provided by section 501(c), provided it didn't run afoul of the "subterfuge" limitation, as it would do if, for example, it had adopted the AIDS caps to deter people who know they are HIV positive from buying the policies at all.

The legislative history is consistent with this interpretation. Both committee reports on which the plaintiffs rely give the example of refusing to sell an insurance policy to a blind person, as does the gloss placed on section 501(c) by the Department of Justice. 28 C.F.R. Pt. 36, App. B § 36.212, p. 601 (1998). A refusal to sell insurance to a blind person is not the same thing as a provision in the policy that if the insured becomes blind, the insurer will not pay the expense of his learning Braille. We find nothing in the language or history of the statute to suggest that the latter refusal would be unlawful. The Department's *Technical Assistance Manual, supra,* § III–3.11000, contains somewhat broader language than either the statute or the regulation or the committee reports,

language about insurers' being forbidden to discriminate on the basis of disability in the sale, terms, or conditions of insurance contracts; but basically this just parrots the statute and the regulation and does not indicate a focused attention to coverage limits. There is, as we have pointed out, a difference between refusing to sell a health-insurance policy at all to a person with AIDS, or charging him a higher price for such a policy, or attaching a condition obviously designed to deter people with AIDS from buying the policy (such as refusing to cover such a person for a broken leg), on the one hand, and, on the other, offering insurance policies that contain caps for various diseases some of which may also be disabilities within the meaning of the Americans with Disabilities Act.

■ The Department has filed an amicus curiae brief that effaces this distinction and embraces the plaintiffs' interpretation of the Act. The Department's regulations interpreting the Americans with Disabilities Act are entitled to *Chevron* deference, *Bragdon v. Abbott, supra,* 118 S.Ct. at 2209; *Paralyzed Veterans of America v. D.C. Arena L.P., supra,* 117 F.3d at 588, but, as we have just seen, do not compel the interpretation for which these plaintiffs contend. We noted recently, in *Commonwealth Edison Co. v. Vega,* 174 F.3d 870, 874–75, (7th Cir.1999), that it is unsettled how much *Chevron* deference is to be given to an agency's informal policy pronouncements. This category includes the *Technical Assistance Manual* as well as the amicus curiae brief; and though we know from *Auer v. Robbins,* 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997), that, in some circumstances at least, an agency's amicus brief is entitled to some deference, it cannot be very great when it is the brief of an agency that has, and has exercised, rulemaking powers yet has unaccountably failed to address a fundamental issue on which the brief takes a radical stance. Cf. *Paralyzed Veterans of America v. D.C. Arena L.P., supra,* 117 F.3d at 588–89. Displacing the regulation of the insurance industry into the federal courts is a sufficiently far-reaching interpretive stride to justify us in requiring the Department to invite deference by a more deliberative, public, and systematic procedure than the filing of an amicus curiae brief. Such a brief in such circumstances cannot claim much democratic legitimacy to set over against the intent of Congress so far as it can be gleaned from the usual interpretive sources—which do not include the brief of one of the parties!

■ We conclude that section 302(a) does not require a seller to alter his product to make it equally valuable to the disabled and to the nondisabled, even if the product is insurance. This conclusion is consistent with all the appellate cases to consider this or cognate issues. *Vaughn v. Sullivan,* 83 F.3d 907, 912–13 (7th Cir. 1996); *Rogers v. Department of Health & Environmental Control,* 174 F.3d 431 (4th Cir.1999); *Parker v. Metropolitan Life Ins. Co.,* 121 F.3d 1006, 1010–14 (6th Cir. 1997) (en banc); *Lenox v. Healthwise of Kentucky, Ltd., supra; Ford v. Schering–Plough Corp.,* 145 F.3d 601, 612–14 (3d Cir.1998); cf. *Modderno v. King,* 82 F.3d 1059, (D.C.Cir.1996). And if it is wrong, the suit must fail anyway, because it is barred by the McCarran–Ferguson Act.

■ That Act, so far as bears on this case, forbids construing a federal statute to "impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). Direct conflict with state law is not required to trigger this prohibition; it is enough if the interpretation would "interfere with a State's administrative regime." *Humana Inc. v. Forsyth,* —— U.S. ——, ——, 119 S.Ct. 710, 717, 142 L.Ed.2d 753 (1999); *Department of the Treasury v. Fabe,* 508 U.S. 491, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993); *Autry v. Northwest Premium Services, Inc.,* 144 F.3d 1037, 1039–44 (7th Cir.1998). The interpretation of section 302(a) of the Americans with Disabilities

Act for which the plaintiffs contend would do this. State regulation of insurance is comprehensive and includes rate and coverage issues, see Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* §§ 2:7, 2:20, 2:26, 2:35 (3d ed.1997), so if federal courts are now to determine whether caps on disabling conditions (by no means limited to AIDS) are actuarially sound and consistent with principles of state law they will be stepping on the toes of state insurance commissioners.

It is one thing to say that an insurance company may not refuse to deal with disabled persons; the prohibition of such refusals can probably be administered with relatively little interference with state insurance regulation, *NAACP v. American Family Mutual Ins. Co.*, 978 F.2d 287 (7th Cir.1992), and anyway this may be a prohibition expressly imposed by federal law because encompassed within the blanket prohibition of section 302(a) of the Americans with Disabilities Act, and so outside the scope of the McCarran–Ferguson Act. It is another thing to require federal courts to determine whether limitations on coverage are actuarially sound and consistent with state law. Even if the formal criteria are the same under federal and state law, displacing their administration into federal court—requiring a *federal* court to decide whether an insurance policy is consistent with *state* law—obviously would interfere with the administration of the state law. The states are not indifferent to who enforces their laws. For the converse situation, of forbidden interference by the states in the administration of federal programs, see *Commonwealth Edison Co. v. Vega, supra,* 174 F.3d 870, 872–74.

It is true that we are not being asked *in this case* to decide whether the AIDS caps were actuarially sound and in accordance with state law. But if the McCarran–Ferguson Act does not apply, then we are certain to be called upon to decide such issues in the next case, when the insurer does not stipulate to them. Mutual of Omaha didn't want to get into these messy issues if it could show that the Americans with Disabilities Act did not apply. If the ADA is fully applicable, insurers will have to defend their AIDS caps by reference to section 501(c), and the federal courts will then find themselves regulating the health-insurance industry, which McCarran–Ferguson tells them not to do.

Section 501(c) itself specifically relates to insurance and thus is not within the scope of McCarran–Ferguson. But the interpretation that the McCarran–Ferguson Act bars is not an interpretation of 501(c); it is an interpretation of section 302(a) that injects the federal courts into the heart of the regulation of the insurance business by the states.

Of course, we can infer from section 501(c)—we have done so earlier in this opinion—and Mutual of Omaha does not deny, that section 302(a) has some application to insurance: it forbids an insurer to turn down an applicant merely because he is disabled. To that extent, as we have already suggested, we can accept (certainly for purposes of argument) that section 302(a) relates specifically to the business of insurance. But thus limited to a simple prohibition of discrimination, section 302(a) does not impair state regulation of insurance; no state wants insurance companies to refuse to insure disabled people. It is only when section 302(a) is interpreted as broadly as it must be for the plaintiffs in this case to prevail that McCarran–Ferguson's reverse preemption comes into play.

Both because section 302(a) of the Americans with Disabilities Act does not regulate the content of the products or services sold in places of public accommodation and because an interpretation of the section as regulating the content of insurance policies is barred by the McCarran–Ferguson Act, the judgment in favor of the plaintiffs must be reversed with directions to enter judgment for the defendant. This does not, however, leave the plaintiffs remediless. If in fact the AIDS caps in the defendant's policies are not consistent

with state law and sound actuarial practices (and whether they are or not, the defendant may be bound by its stipulation, though this we needn't decide), the plaintiffs can obtain all the relief to which they are entitled from the state commissioners who regulate the insurance business. Federal law is not the only source of valuable rights.

REVERSED.

TERENCE T. EVANS, Circuit Judge, dissenting.

The Americans with Disabilities Act is a broad, sweeping, protective statute requiring the elimination of discrimination against individuals with disabilities. *See Talanda v. KFC Nat'l Management Co.,* 140 F.3d 1090 (7th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 164, 142 L.Ed.2d 134 (1998). Because I believe the insurance policies challenged in this case discriminate against people with AIDS in violation of the ADA, I dissent.

The majority believes we are being asked to regulate the content of insurance policies—something we should not do under the ADA. But as I see it we are not being asked to regulate content; we are being asked to decide whether an insurer can discriminate against people with AIDS, refusing to pay for them the same expenses it would pay if they did not have AIDS. The ADA assigns to courts the task of passing judgment on such conduct. And to me, the Mutual of Omaha policies at issue violate the Act.

Chief Judge Posner's opinion likens the insurance company here to a camera store forced to stock cameras specially designed for disabled persons. While I agree that the ADA would not require a store owner to alter its inventory, I think the analogy misses the mark. The better analogy would be that of a store which lets disabled customers in the door, but then refuses to sell them anything but inferior cameras. To pick up on another analogy raised at oral argument, we are not being asked to force a restaurant to alter its menu to accommodate disabled diners; we are being asked to stop a restaurant that is offering to its nondisabled diners a menu containing a variety of entrees while offering a menu with only limited selections to its disabled patrons. Section 501(c)'s "safe harbor" would allow Mutual of Omaha to treat insureds with AIDS differently than those without AIDS if the discrimination were consistent with Illinois law or could be justified by actuarial principles or claims experience. But Mutual of Omaha conceded that its AIDS and ARC caps do not fall under the ADA's safe harbor protection.

The parties stipulated that the very same affliction (e.g., pneumonia) may be both AIDS-related and not AIDS-related and that, in such cases, coverage depends solely on whether the patient has AIDS. In my view that is more than enough to trigger an ADA violation. Chief Judge Posner reasons that, although the policies appear to discriminate solely based on an insured's HIV status, they really don't, when you consider the nature of AIDS. He suggests that the phrase "AIDS related conditions" embodies a unique set of symptoms and afflictions that would make it easy for the insurance company to determine with certainty whether an expense incurred for a particular illness is "AIDS-related" and therefore subject to the cap. His analysis—charitable to Mutual of Omaha to be sure—may very well be medically sound. But it doesn't come from the insurance policies. The policies don't even hint at what illnesses or afflictions might fall within the ARC exclusion. Nor has the medical community embraced an accepted definition for what "conditions" are "AIDS-related." The practical effect of all this, as Mutual of Omaha concedes, is that coverage for certain expenses would be approved or denied based solely on whether the insured had AIDS. Given that the ADA is supposed to signal a "clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," *see* 42 U.S.C.

§ 12101(b)(1), I would use the statute to right the wrong committed by Mutual of Omaha.

I also part company with the majority on the McCarran–Ferguson Act analysis, and I think the faultiness of its conclusion is evident in the way the issue is framed. The Chief Judge writes: "It is one thing to say that an insurance company may not refuse to deal with disabled persons; the prohibition of such refusals can probably be administered with relatively little interference with state insurance regulation.... It is another thing to require federal courts to determine whether limitations on coverage are actuarially sound and consistent with state law." Slip op. at 564. This is somewhat misleading because, as the majority acknowledges, the question of whether these caps are actuarially sound or consistent with state law has been taken out of the equation by Mutual of Omaha's concession in the parties' stipulation. Consistent with McCarran–Ferguson we can—and we should—decide exactly what the majority seemed to think is permissible: whether an insurer may refuse to deal with disabled persons on the same terms as nondisabled persons. Because any conceivable justification for the caps (under section 501(c)) is not at issue, and because an insurer cannot legally decide to pay or not pay expenses based solely on whether an insured has AIDS and is therefore disabled under the ADA, I dissent from the opinion of the court.