EQUAL EMPLOYMENT OPPOR-
TUNITY COMMISSION,
Plaintiff–Appellant,

v.

STATEN ISLAND SAVINGS BANK,
Defendant–Appellee,

and

Guardian Life Insurance Company,
Defendant.

Equal Employment Opportunity
Commission, Plaintiff–
Appellant,

v.

The Chase Manhattan Bank,
Defendant–Appellee,

and

Unum Life Insurance Company
of America, Defendant.

Docket Nos. 99–6011, 99–6035.

United States Court of Appeals,
Second Circuit.

Argued Oct. 28, 1999.

Decided March 23, 2000.

Barbara L. Sloan, Equal Employment Opportunity Commission, Washington, DC (C. Gregory Stewart, General Counsel, Philip B. Sklover, Associate General Counsel, Vincent J. Blackwood, Assistant General Counsel, and Jodi B. Danis, on the brief), for Plaintiff–Appellant.

Roger H. Briton, Jackson, Lewis, Schnitzler & Krupman, Woodbury, NY (Christopher G. Bell, Jackson, Lewis, Schnitzler & Krupman, Minneapolis, MN, on the brief), for Defendant–Appellee Staten Island Savings Bank.

Meryl R. Kaynard, Chase Manhattan Legal Department, New York, NY (Matthew G. Leonard, on the brief), for Defendant–Appellee The Chase Manhattan Bank.

Gregory G. Katsas and Gregory A. Castanias, Jones, Day, Reavis & Pogue, Washington, DC, and Phillip E. Stano and Terri Sorota, The American Council of Life Insurance, Washington, DC, submitted a brief for Amicus Curiae The American Council of Life Insurance.

Ann Elizabeth Reesman and Corrie L. Fischel, McGuiness & Williams, Washington, DC, and Stephen A. Bokat, Robin S. Conrad and Sussan Mahallati Kysela, National Chamber Litigation Center, Inc., Washington, DC, submitted two joint briefs for Amici Curiae Equal Employment Advisory Counsel and Chamber of Commerce of the United States of America.

Before: FEINBERG, CARDAMONE, and SACK, Circuit Judges.

SACK, Circuit Judge:

The issue raised in these appeals is whether, under Title I of the Americans with Disabilities Act, an employer may lawfully offer more generous disability benefits for physical disabilities than for mental and emotional disabilities. We add our voice to a chorus of other United States Courts of Appeals that have ruled that such disparate treatment is not forbidden by the Act.

Plaintiff the Equal Employment Opportunity Commission (the "EEOC") appeals from the separate judgments of the United States District Court for the Eastern District of New York (Reena Raggi, *Judge*) and the United States District Court for the Southern District of New York (Whitman Knapp, *Judge*) dismissing under Fed. R.Civ.P. 12(b)(6) the EEOC's respective complaints against defendants The Chase Manhattan Bank ("Chase") and Staten Island Savings Bank ("SISB") for failure to state a claim. The EEOC alleged that the long-term disability plans offered by Chase's predecessor corporation and SISB to their employees violated Title I of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12111–12117, by providing less coverage for mental and emotional disabilities than for physical disabilities. In each case the district court dismissed the EEOC's complaint on the sole ground that Title I of the ADA does not prevent an employer from offering a long-term disability plan that provides different benefits for different disabilities.

Although the cases were brought and the motions to dismiss were heard and decided entirely separately, we heard them and now decide them together because the EEOC raises essentially the same issues in each appeal. We agree with the results reached by both district courts and affirm for the reasons set forth below.

## BACKGROUND

### I. *EEOC v. Staten Island Savings Bank*

The complaint against SISB in this action was brought by the EEOC on behalf of a named former SISB employee and other similarly situated persons. The SISB employee was enrolled in an employee disability benefit plan offered by SISB and administered by Guardian Life Insurance Company ("Guardian"). According to the plan:

"Disability" means: (a) an employee is not able to perform all of the material duties of his regular occupation on a full-time basis due to sickness or injury; and (b) the employee's current monthly earnings, if any, are, solely due to his disability, less than 80% of his indexed prior monthly earnings. While an employee is so disabled, he can engage in: (i) any other suitable occupation full or part-time; (ii) some but not all of the material duties of his regular occupation full or part-time; or (iii) all of the material duties of his regular occupation part-time.

On August 22, 1991, the complainant became unable to work because of a panic disorder with obsessive-compulsive symptoms. In March 1992, Guardian determined that the complainant was disabled within the meaning of the SISB plan and eligible for benefits effective March 22, 1992.

The SISB plan provided set monthly payments calculated on the basis of an employee's prior monthly earnings rather than the costs of the disability. Benefits were generally available under the plan for any disability starting before an employee reached the age of sixty until the Social Security Normal Retirement Age, however long that period might be. Disability benefits for "mental or emotional conditions," however, were in most cases available for no more than two years. On April 1, 1994, Guardian wrote a letter to the complainant stating that, pursuant to the two-year limitation, her benefits had been terminated as of March 21, 1994.

On September 8, 1997, the EEOC filed its complaint against SISB and Guardian in the United States District Court for the Eastern District of New York, alleging that the SISB plan discriminates on the basis of mental disability in violation of Title I of the ADA. SISB and Guardian filed separate motions to dismiss for failure to state a claim pursuant to Fed. R.Civ.P. 12(b)(6). They argued, *inter alia*, that Title I of the ADA does not forbid long-term disability benefit plans from providing different benefits for different disabilities.[1] The district court dismissed the complaint on the sole ground that Title I of the ADA permits long-term disability benefit plans to provide varying levels of coverage for mental and physical disabilities.

The EEOC has appealed only from the dismissal of its claims against SISB.

### II. *EEOC v. Chase Manhattan Bank*

The complaint against Chase was brought by the EEOC on behalf of another complainant and "at least 27 other similarly situated individuals." This complainant was an employee of Chemical Bank, which later merged with Chase. Chase does not dispute its legal responsibility for the acts

---

1. SISB and Guardian also argued that (1) the SISB plan falls within the ADA's safe harbor provision, 42 U.S.C. § 12201(c); (2) the complainant was not a qualified individual with a disability, as required by the ADA; and (3) the complainant's EEOC charge was untimely filed. The district court did not reach these arguments, nor do we.

of Chemical Bank that were the subject of the complaint. On May 11, 1993, the complainant became unable to work because of major depression and anxiety. On November 9, 1993, she applied for long-term disability benefits under her employer's long-term disability plan, which was administered by Unum Life Insurance Company of America ("Unum"). Unum determined that the complainant was disabled within the meaning of the plan, and granted her benefits beginning December 1, 1993. As with the SISB plan, the benefits took the form of monthly payments calculated on the basis of an employee's prior monthly compensation and did not bear a relationship to the costs of the disability.

The plan provided benefits to employees absent from work because of "Temporary Disability" as well as "Total and Permanent Disability." According to the plan:

"Total and Permanent Disability" or "Totally and Permanently Disabled" means any medically determinable physical or mental impairment that can be expected to result in death or that can be expected to last for a continuous period of not less than 12 months which disability renders the Participant unable to physically perform the duties of the position for which employed by a Participating Company or the duties of any other substantial gainful activity....

"Temporary Disability" or "Temporarily Disabled" means any medically determinable physical or mental impairment that is expected to last for a continuous period of more than 27 consecutive weeks which disability renders the Participant unable to physically perform

the duties of the position for which employed by a Participating Company: *provided* that such impairment is not expected to result in the Participant being deemed to have a Total and Permanent Disability....

Disability benefits were generally available under the plan for any "Total and Permanent Disability" occurring at age sixty or less until the attainment of age sixty-five. The plan provided, however, that benefits for a disability caused by "a mental disease or disorder" would last for no more than eighteen months.[2] The complainant's long-term disability benefits were terminated on May 31, 1995 because of the eighteen-month limitation on mental disability benefits.

On September 8, 1997, the same day that the EEOC filed suit against SISB and Guardian in the United States District Court for the Eastern District of New York, the EEOC also filed its complaint against Chase and Unum in the United States District Court for the Southern District of New York. The complaint alleged that the long-term disability benefit plan offered to the complainant and other similarly situated employees discriminated on the basis of mental disability in violation of Title I of the ADA.

Chase and Unum filed separate motions to dismiss for failure to state a claim upon which relief could be granted pursuant to Fed.R.Civ.P. 12(b)(6), arguing, *inter alia,* that Title I of the ADA does not forbid long-term disability benefit plans from providing different benefits for different disabilities.[3] The district court agreed, granting both defendants' motions to dis-

---

**2.** The plan also provided that benefits for "Temporary Disabilities" would last for no more than eighteen months. Thus, the duration of benefits for temporary mental disabilities and temporary physical disabilities would be the same. We understand the complaint to allege that the complainant was totally and permanently disabled and that her benefits were terminated after eighteen months because she had a mental disability, not because she had a temporary disability.

**3.** Chase and Unum also argued that (1) the plan in question falls within the ADA's safe harbor provision, 42 U.S.C. § 12201(c); (2) the complaint did not and could not allege that the complainant was a qualified individual with a disability, as required by the ADA; and (3) the EEOC should be barred from bringing suit by nonmutual defensive collateral estoppel. The district court did not reach these arguments, nor do we.

miss on the sole ground that Title I of the ADA does not require equal long-term disability benefits for mental and physical disabilities.

The EEOC appeals only from the dismissal of its claims against Chase.

## DISCUSSION

### I. Standard of Review

We review *de novo* the dismissal of a complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. *See Castellano v. City of New York,* 142 F.3d 58, 66 (2d Cir.), *cert. denied,* 525 U.S. 820, 119 S.Ct. 60, 142 L.Ed.2d 47, *and cert. denied,* 525 U.S. 922, 119 S.Ct. 276, 142 L.Ed.2d 228 (1998).

A complaint may be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Drake v. Delta Air Lines, Inc.,* 147 F.3d 169, 171 (2d Cir.1998) (quoting *Conley* ). On a motion to dismiss, the facts in the complaint are presumed to be true, and all reasonable inferences are drawn in the plaintiff's favor. *See Lee v. Bankers Trust Co.,* 166 F.3d 540, 543 (2d Cir.1999). Documents attached to a complaint such as the disability plans at issue here and the letters explaining the termination of the complainants' benefits may be considered on a motion to dismiss. *See* Fed.R.Civ.P. 10(c); *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 674 (2d Cir. 1995); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992).

### II. Scope of Title I of the ADA

■ Today we join six other Courts of Appeals in concluding that Title I of the ADA does not bar entities covered by the statute from offering different long-term disability benefits for mental and physical disabilities. *See Weyer v. Twentieth Cen-* *tury Fox Film Corp.,* 198 F.3d 1104, 1116–18 (9th Cir.2000); *Kimber v. Thiokol Corp.,* 196 F.3d 1092, 1101–02 (10th Cir. 1999); *Lewis v. Kmart Corp.,* 180 F.3d 166, 170 (4th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 978, 145 L.Ed.2d 929 (2000); *Ford v. Schering–Plough Corp.,* 145 F.3d 601, 608–10 (3d Cir.1998), *cert. denied,* 525 U.S. 1093, 119 S.Ct. 850, 142 L.Ed.2d 704 (1999); *Parker v. Metropolitan Life Ins. Co.,* 121 F.3d 1006, 1015–19 (6th Cir.1997) (en banc), *cert. denied,* 522 U.S. 1084, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998); *EEOC v. CNA Ins. Cos.,* 96 F.3d 1039, 1044–45 (7th Cir.1996); *cf. McNeil v. Time Ins. Co.,* 205 F.3d 179, 186–190 (5th Cir.2000) (holding that health insurance plan that caps benefits for AIDS does not violate Title III of ADA); *Doe v. Mutual of Omaha Ins. Co.,* 179 F.3d 557, 559–64 (7th Cir.1999) (same), *cert. denied,* —— U.S. ——, 120 S.Ct. 845, 145 L.Ed.2d 714 (2000); *Modderno v. King,* 82 F.3d 1059, 1060–62 (D.C.Cir.1996) (holding that health insurance plan that caps mental disability benefits does not violate Section 504 of Rehabilitation Act, 29 U.S.C. § 794, which forbids disability-based discrimination in certain federal and federally assisted programs and activities), *cert. denied,* 519 U.S. 1094, 117 S.Ct. 772, 136 L.Ed.2d 717 (1997).

We attempt first to ascertain the ADA's meaning from the language of the ADA itself. Title I of the ADA provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

ADA § 102(a), 42 U.S.C. § 12112(a). Discrimination is defined in the next statutory subsection to include:

> participating in a contractual or other arrangement or relationship that has the

effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter (such relationship includes a relationship with . . . an organization providing fringe benefits . . .)
. . . .

*Id.* § 102(b), 42 U.S.C. § 12112(b).

We find in this language no unambiguous answer to the question whether Title I of the ADA prevents covered entities from offering long-term disability benefit plans that provide different coverage for different disabilities. *See Lewis,* 180 F.3d at 170; *cf. Mutual of Omaha,* 179 F.3d at 559–60 (observing that question whether similar language in § 302(a) of the ADA, 42 U.S.C. § 12182(a), prevents health insurance plans from capping benefits for particular disabilities "cannot be resolved by reference simply to the language of section 302(a)"). On the one hand, the language of the statute is capacious, and we recognize that it is our duty to interpret remedial statutes broadly. *See Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 722 (2d Cir.1994) (interpreting Rehabilitation Act), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995). The plans at issue do employ facially discriminatory classifications that target the mentally and emotionally disabled for more limited coverage on the basis of their particular form of disability. On the other hand, the complainants here enjoyed access to exactly the same benefit plans as did their physically disabled and non-disabled coworkers. The mentally and emotionally disabled were not required to pay more for their coverage or slated to receive a different plan. They were given access to the same fringe benefit plan as their coworkers and, in that sense, enjoyed equal "compensation, . . . terms, conditions, and privileges of employment," as required by § 102 of the ADA. Viewed through this lens, they were not discriminated against at all. For these reasons, we cannot determine using only the plain language of the ADA whether the conduct of the complainants' employers was "discriminatory in the usual sense of the term." *CNA Ins. Co.,* 96 F.3d at 1044.

While equal access of the sort present here is not always enough to render conduct nondiscriminatory, *cf. Loving v. Virginia,* 388 U.S. 1, 8, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (holding that "fact of equal application" did not render racial classification nondiscriminatory), we are persuaded, when reading the language of the statute in light of the long-term history of disability plans, that Title I of the ADA does not require disability benefit plans to provide equal benefits for mental and physical disabilities. The ADA, unclear on its face, does not specifically condemn the historic and nearly universal practice inherent in the insurance industry of providing different benefits for different disabilities. *See Rogers v. Department of Health & Envtl. Control,* 174 F.3d 431, 435 (4th Cir.1999) ("Insurers have historically and consistently made distinctions between mental and physical illness in offering health and disability coverage."). The interpretation of Title I urged upon us by the EEOC would require far-reaching changes in the way the insurance industry does business. Of course Congress could require those modifications to be made, but we are reluctant to infer such a mandate for radical change absent a clearer legislative command. We agree with the Ninth Circuit and the other circuits that have addressed the issue that "had Congress intended to control which coverages had to be offered by employers, it would have spoken more plainly because of the well-established marketing process to the contrary." *Weyer,* 198 F.3d at 1116; *accord CNA Ins. Co.,* 96 F.3d at 1044 ("Without far stronger language in the ADA supporting this result, we are loath to read into it [this] rule."); *cf. Mutual of Omaha,* 179 F.3d at 560 (interpreting similar language in § 302(a) of the ADA, 42 U.S.C. § 12182(a), and concluding, "[h]ad Congress purposed to impose so . . . vast a supervisory responsibility on the federal

courts, we think it would have made its intention clearer").

The legislative history of the ADA strongly supports this conclusion. The Reports of the House Judiciary Committee and the Senate Committee on Labor and Human Resources contain identical language stating that "it is permissible for an employer to offer insurance policies that limit coverage for certain procedures or treatments," so long as persons with disabilities "have equal access to the ... insurance coverage that is provided by the employer to all employees." H.R.Rep. No. 101–485(III), at 38 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 445, 460–61; S.Rep. No. 101–116, at 29 (1989). The House Report illustrates by way of example that it is permissible for an insurance plan to contain "a limit on the extent of kidney[ ] dialysis or whether dialysis will be covered at all, or a limit on the amount of blood transfusions or whether transfusions will be covered." H.R.Rep. No. 101–485(III), at 38, *reprinted in* 1990 U.S.C.C.A.N. at 460. The Senate Report provides the example that insurance plans may offer "only a specified amount per year for mental health coverage." S.Rep. No. 101–116, at 29.

We therefore agree with our sister circuits that "[s]o long as every employee is offered the same plan regardless of that employee's contemporary or future disability status, then no discrimination has occurred even if the plan offers different coverage for various disabilities." *Ford,* 145 F.3d at 608; *accord Weyer,* 198 F.3d

at 1116; *Kimber,* 196 F.3d at 1101–02; *Rogers,* 174 F.3d at 436; *Parker,* 121 F.3d at 1015–16; *CNA Ins. Co.,* 96 F.3d at 1044–45; *cf. Modderno,* 82 F.3d at 1060–62 (reaching same conclusion under § 504 of Rehabilitation Act, 29 U.S.C. § 794).

The EEOC argues that the scope of the ADA's general prohibitions is helpfully clarified by § 501 of the Act, codified at 42 U.S.C. § 12201, which provides a safe harbor for certain insurance plans. The essence of the EEOC's argument is "that the insurance exemption [i.e., the 'safe harbor'] has no function if [§ 102 of the ADA] does not regulate the content of insurance policies," *Mutual of Omaha,* 179 F.3d at 562, such as the plans at issue here. But the safe harbor provision does not shed light on the scope of the anti-discrimination provisions of § 102. Section 501 provides that, within the ambit of the ADA's anti-discrimination prohibitions, discrimination on the basis of disability will not be actionable if a plan is consistent with or not subject to state law, and § 501 is not used as a subterfuge to evade the purposes of the ADA.[4] Section 501 does not itself delineate the reach of the general prohibitions of Title I of the ADA. Section 501's provision of a safe harbor for plans that meet its criteria is as consistent with the position of the defendants that § 102 regulates only access to benefit plans as it is with the position of the EEOC that § 102 regulates the content of benefit plans. Under both interpretations, § 501 would serve a meaningful purpose by immunizing from liability distinctions based on disability

4. Section 501 of the ADA, the safe harbor provision, reads as follows:

Subchapters I through III of this chapter and title IV of this Act shall not be construed to prohibit or restrict—

(1) an insurer, hospital or medical service company, health maintenance organization, or any agent, or entity that administers benefit plans, or similar organizations from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law; or

(2) a person or organization covered by this chapter from establishing, sponsoring,

observing or administering the terms of a bona fide benefit plan that are based on underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law; or

(3) a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that is not subject to State laws that regulate insurance.

Paragraphs (1), (2), and (3) shall not be used as a subterfuge to evade the purposes of subchapter[s] I and III of this chapter. ADA § 501, 42 U.S.C. § 12201.

that are consistent with or not regulated by state law and that do not use § 501 as a subterfuge within the meaning of the ADA. *Cf. Mutual of Omaha,* 179 F.3d at 562 (recognizing, for similar reasons, that § 501 does not helpfully define scope of general prohibitions contained in Title III of the ADA).

■ The EEOC argues that other courts, including the district courts below, have improperly construed the language of the ADA by relying on the incorrect premise that the ADA prohibits only discrimination between the disabled and non-disabled, and not individualized discrimination on the basis of a particular disability. *See Weyer,* 198 F.3d at 1116; *Rogers,* 174 F.3d at 434; *Ford,* 145 F.3d at 608–09; *Parker,* 121 F.3d at 1015–16. We agree with the EEOC that the ADA generally affords "individualized protection" against illegal conduct within its reach. *See Olmstead v. L.C.,* 527 U.S. 581, 119 S.Ct. 2176, 2186 & n. 10, 144 L.Ed.2d 540 (1999) (rejecting view that ADA requires no more than evenhanded treatment between the disabled and non-disabled). The ADA states clearly that "[n]o covered entity shall discriminate against a qualified *individual* with a disability because of the disability *of such individual.*" 42 U.S.C. § 12112(a) (emphasis added). Moreover, Title VII of the Civil Rights Act of 1964, to which this Court has looked in interpreting the ADA, *see Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 52 (2d Cir.1998), has as its "principal focus ... the protection of the individual employee." *Connecticut v. Teal,* 457 U.S. 440, 453–54, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982); *accord Spirt v. Teachers Ins. & Annuity Ass'n,* 691 F.2d 1054, 1061–62 (2d Cir.1982) (noting that Title VII "focuses on fairness to individuals rather than fairness to classes" (internal

quotation marks and citation omitted)), *vacated on other grounds,* 463 U.S. 1073, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983), *on remand,* 735 F.2d 23 (2d Cir.1984).[5]

That being said, the ADA's "individualized focus" does not require us to conclude that the ADA regulates the content of long-term disability benefit programs. It is fully consistent with an understanding that the ADA protects the individual from discrimination based on his or her disability to read the Act to require no more than that access to an employer's fringe benefit program not be denied or limited on the basis of his or her particular disability.

■ The EEOC calls this Court's attention to its informal interpretive guidance on a related subject. *See* EEOC: Interim Guidance on Application of ADA to Health Insurance (June 8, 1993), *reprinted in* 8 *Fair Employment Practices Manual* 405:7115 (BNA 2000). That document states that "health-related insurance distinctions that are based on disability may violate the ADA," such as when a plan "singles out a particular disability (*e.g.,* deafness, AIDS, schizophrenia), [or] a discrete group of disabilities (*e.g.,* cancers, muscular distrophies, kidney diseases)" for lesser benefits. *Id.* at 405:7118. "Under the law of this Circuit, the EEOC's regulations are entitled to 'great deference' in interpreting the ADA." *Muller v. Costello,* 187 F.3d 298, 312 (2d Cir.1999) (quoting *Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 150 n. 3 (2d Cir.1998)). But this Court has not yet determined the degree of deference due to an informal publication such as the EEOC Interim Guidance that has not been subject to notice and comment. *See Leonard F. v. Israel Discount Bank,* 199 F.3d 99, 106 n. 5 (2d Cir.1999); *see also Commissioner v.*

---

**5.** Thus, in the hiring and firing context, it has been observed that an employer who discriminates against an individual because of his or her membership in a protected class acts wrongfully even if it treats favorably other persons within the protected class. *See O'Connor v. Consolidated Coin Caterers Corp.,*

517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (Age Discrimination in Employment Act); *Teal,* 457 U.S. at 455, 102 S.Ct. 2525 (Title VII); *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 58–59 (4th Cir.1995) (ADA).

*Keystone Consolidated Indus., Inc.,* 508 U.S. 152, 162 n. 3, 113 S.Ct. 2006, 124 L.Ed.2d 71 (1993) (leaving this issue "to another day"). This Court also has not determined how much deference should be granted to an agency interpretation that is inconsistent with the legislative history of a statute. *See WLNY–TV, Inc. v. FCC,* 163 F.3d 137, 143 & n. 3 (2d Cir.1998).

We need not decide these questions today for two reasons. First, the Interim Guidance states at the outset that it addresses only health insurance and "does not address . . . the application of the ADA to other types of 'fringe benefits,' such as . . . disability insurance," which "will be addressed in future documents." EEOC Interim Guidance at 405:7115. We cannot place great reliance on an informal guidance that explicitly states that it does not apply to the question at hand. Second, the Interim Guidance is in tension with the "Interpretive Guidance on Title I of the Americans with Disabilities Act" published in the Code of Federal Regulations. *See* 29 C.F.R. Part 1630, App. § 1630.5 (noting that EEOC's published regulation on fringe benefits "is intended to require that employees with disabilities be accorded equal access to *whatever health insurance coverage the employer provides to other employees*" (emphasis added)). Under these circumstances, we decline to defer to the ·interpretive reasoning contained in the Interim Guidance.

Finally, we note, as have other circuits, that in 1996, Congress enacted the Mental Health Parity Act, Pub.L. No. 104–204, Title VII, §§ 701–03, 110 Stat. 2874, 2944–50 (1996) (codified primarily at 29 U.S.C. § 1185a and 42 U.S.C. § 300gg–5) (the "MHPA"), which restricts the ability of health insurance plans to provide lower benefit limits for mental conditions than physical conditions. We note also that in 1999, bills were introduced in both the House and the Senate to further equalize the provision of physical and mental health benefits. *See* Mental Health and Substance Abuse Parity Amendments of 1999,

H.R. 1515, 106th Cong. (1999); Mental Health Equitable Treatment Act of 1999, S. 796, 106th Cong. (1999). Other circuits have reasoned that "Congress' passage of the Mental Health Parity Act suggests Congress believed that the ADA· neither governs the content of insurance policies nor requires parity between physical and mental illness." *Parker,* 121 F.3d at 1018; *see also Weyer,* 198 F.3d at 1117 (discussing MHPA and similar predecessor bill that was defeated in the Senate); *Ford,* 145 F.3d at 610 (same); *cf. CNA,* 96 F.3d at 1044 (decided before enactment of MHPA, and addressing only defeated predecessor bill). The same inference might be drawn from Congress's even more recent consideration of further mental health parity bills.

■ We decline, however, to place as much weight on this subsequent legislative history as do some of our sister circuits for two reasons. First, "subsequent legislative history. is generally a 'hazardous basis for inferring the intent of an earlier' Congress." *Pension Benefit Guaranty Corp. v. LTV Corp.,* 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (quoting *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326,· 4 L.Ed.2d 334 (1960)). Second, the MHPA and the other proposed bills address themselves chiefly to non-disability based distinctions. It would be rational for Congress to consider and take action against non-disability based forms of discrimination even if the ADA already regulated disability-based distinctions in the content of fringe benefit plans.

Notwithstanding our conclusion with respect to this subsequent legislative history, we agree with the other circuits to have addressed the issue that the plain language of Title I of the ADA "does not require equal coverage for every type of disability" and that "such a requirement, if it existed, would destabilize the insurance industry in a manner definitely not intended by Congress when passing the ADA." *Ford,* 145 F.3d at 608. In light of the evidence that Congress did not intend to

effect such sweeping change, we decline to read the statute in the manner proposed by the EEOC. The district courts below properly dismissed the complaints before them on the ground that Title I of the ADA does not prevent long-term disability plans from providing different benefits for different disabilities.

### III. Defendants' Other Contentions

The defendants have advanced several arguments on appeal in addition to their contention that Title I of the ADA does not reach the distinctions made by the long-term disability plans at issue. In light of our conclusion with respect to the defendants' principal argument, it is not necessary for us to decide these other issues, none of which was ruled on by either district court.

### CONCLUSION

For the foregoing reasons, the judgments of the district courts are affirmed.