OPINION
{¶ 1} Defendant-appellant/cross-appellee, Joseph A. Ridgeway, III ("the Father"), and plaintiff-appellee/cross-appellant, Janice C. Harbour ("the Mother"), appeal from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, ordering the Father to pay support to appellee on behalf of the parties' minor child, and denying the Mother's request for an order that the Father pay interest on child support arrearages that had accrued prior to the entry of judgment.
 {¶ 2} The genesis of the present appeal occurred on February 21, 1996, when the Mother filed a complaint in the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, to establish the parent-child relationship between the Father and the minor child, Anna C. Harbour, born August 16, 1995. She also requested child support. By judgment entry journalized September 17, 1997, the trial court adopted an earlier magistrate's decision finding that the parent-child relationship had been established between the Father and the minor child. On September 19, 1997, the Mother filed a motion for temporary child support. On February 18, 1998, the Father filed a motion for reallocation of parental rights and responsibilities, requesting that he be designated the residential parent and sole legal custodian of Anna. On February 25, 1998, the Mother notified the trial court, in writing, that her residence address had changed from an address in Columbus, Ohio to an address in Charlotte, North Carolina.
 {¶ 3} On October 6, 1999, following a hearing on the Mother's motion for temporary child support, the magistrate filed an order obligating the Father to pay to the Mother $2,000 per month as and for temporary child support. This represented a roughly $700-per-month downward deviation from the amount of child support that would have resulted from a calculation pursuant to the Child Support Guidelines and applicable worksheet. The magistrate based his conclusion that such a deviation was in Anna's best interest on the fact that the Mother had relocated to North Carolina and the Father had agreed to exercise his visitation with Anna in North Carolina and at his own expense. By agreement of the parties, the order provided for the Father to exercise visitation with Anna during certain hours one weekend per month. The parties further agreed that the Father's visitation with Anna would be supervised, and that the Father would bear the cost of such supervision. The magistrate also ordered the Mother to maintain health insurance for Anna and the Father to pay 90 percent of Anna's extraordinary uncovered medical expenses.
 {¶ 4} On December 22, 1999, the Mother filed a motion for contempt and for attorney fees based upon the Father's alleged failure to obey the court's order with respect to payment of temporary child support. The magistrate found the Father in contempt and, by order filed March 10, 2000, ordered that the Father pay the entire child support arrearage within 30 days thereof. The order did not set forth the specific amount of the past due support. By agreement of the parties, the magistrate ordered an enlargement, by several hours, of the Father's one weekend per month visitation time.
 {¶ 5} On March 1, 2001, the Father filed a motion seeking expanded temporary visitation with Anna. Specifically, he sought overnight visits with Anna in North Carolina and in Ohio. The magistrate granted this motion in part, by order dated April 11, 2001. Therein, the magistrate expanded the Father's visitation with Anna to one overnight visit per month to be exercised in North Carolina. In the meantime, the Father's February 18, 1998 motion for reallocation of parental rights and responsibilities remained pending due to numerous delays of various types.
 {¶ 6} Finally, on September 4, 2001, the parties submitted and the court journalized an agreed order setting forth detailed agreements regarding the exercise of parenting time. The Father withdrew his request to be named residential parent and sole legal custodian of Anna. The agreed order specifically noted that the parties had not reached an agreement with respect to child support and arrearages of temporary child support. On October 22, 2001, in lieu of live testimony, the parties entered into joint stipulations and offered joint exhibits for the court's consideration of the child support issues, including the parties' tax returns for relevant years.
 {¶ 7} On June 7, 2002, the matter came before the magistrate for a hearing, at which time the parties offered no testimony but simply reaffirmed their joint stipulations. They later supplemented the same with copies of two additional tax returns of the Father. On November 18, 2002, the magistrate issued a decision on the issues related to child support. He ordered a downward deviation in guideline child support for the time period following the Mother's relocation to North Carolina because, according to the magistrate, the Father incurred expenses in traveling there in order to exercise visitation with Anna.
 {¶ 8} The magistrate deviated from the guideline child support figure by roughly $1,000 per month, and made specific orders of monthly child support for each year since Anna's birth. The magistrate then used these amounts to calculate the exact amount owed in arrearages. The magistrate noted that all temporary support that the Father had paid would be credited against the total arrearage, but did not specify the precise amount of the credit. The ongoing child support order was set at $2,900 per month. The magistrate also dealt with other matters, such as payment of extraordinary uncovered medical expenses, award of the child dependency tax exemption, and payment of attorney and expert fees. Noteworthy is the lack of specific findings or reference to any evidence regarding how many times the Father actually traveled to North Carolina or flew Anna to Ohio to exercise visitation, or how much he actually spent on travel and related expenses necessitated by visitation with Anna.
 {¶ 9} On December 2, 2002, the Mother filed objections to the magistrate's decision. Therein, the Mother argued that the magistrate erred in determining that a $1,000 per month downward deviation was appropriate. She argued that the deviation was unwarranted because the Father incurred far less than this amount in monthly expenses associated with exercising visitation with Anna. The Mother also argued that the magistrate should have ordered the Father to pay interest on the liquidated child support arrearages.
 {¶ 10} Also on December 2, 2002, the Father filed objections to the magistrate's decision. He argued that the magistrate erroneously calculated guideline child support for several calendar years, and erred in ordering him to pay expert fees and attorney fees. On April 25, 2003, the Father filed a supplemental memorandum in support of his objections. Therein, he argued that the magistrate incorrectly applied former R.C.3113.215, which was repealed in March 2001, and replaced with, inter alia, R.C. 3119.04, which prescribes a different method for calculating child support in cases where, as here, the parents' combined gross income exceeds the sum of $150,000. The Father also argued that the magistrate erred in excluding from the Mother's gross income any portion of tax refunds she received when such portion was attributable to her having taken advantage of the federal Earned Income Credit. The Father also argued that the magistrate should have imputed income to the Mother for tax year 1996, for which she reported no income but did report childcare expenses.
 {¶ 11} On May 5, 2003, the Mother filed a supplemental memorandum in support of her objections. Therein, she further elucidated her arguments in support of her objections, and also responded to the Father's objections. She pointed out that a statute is always presumed to apply prospectively unless the General Assembly expressly makes it retrospective in application. As such, she argued, the magistrate correctly applied R.C. 3113.215, which was in effect during the time period for which the Mother sought and received an order of support. If the magistrate had applied the current statute, the Mother urged, the Father would be rewarded for not paying child support in a timely fashion.
 {¶ 12} The Mother also argued that the Earned Income Credit-related portions of her tax refunds constitute means-tested government assistance and thus do not fall within the definition of "income" for child support purposes. Finally, the Mother argued that it was within the magistrate's discretion to not impute income to her, noting that the Father presented no evidence with respect to the Mother's employment potential and probable earnings, including evidence regarding her occupational qualifications and work history, job opportunities in her area, and regional salary levels. She argued it was appropriate for the magistrate to include the Mother's childcare expenses in his calculations because the evidence adduced clearly demonstrated that these expenses resulted from the fact that the Mother attended school on a full-time basis and was working toward a degree.
 {¶ 13} On March 5, 2004, the court journalized its decision and entry. Therein, the court overruled both parties' objections and adopted the magistrate's decision in full. The Father appealed from this judgment entry, and the Mother asserted a cross-appeal. The Father sets forth three assignments of error, as follows:
1. The trial court abused its discretion and erred by utilizing R.C.3113.215 et seq. to render its decision instead of R.C. 3119.04 et seq., which was the current statute in effect at the time of the hearing when child support was determined.
2. The trial court abused its discretion by not imputing income to Plaintiff-Appellee pursuant to R.C. 3119.05 et seq.
3. The trial court abused its discretion by not including income of the Plaintiff-Appellee and considering the earned income credit of the Plaintiff-Appellee as a means tested public assistance program pursuant to R.C. 3119.06 et seq.
 {¶ 14} The Mother sets forth two assignments of error for our review, as follows:
1. The trial court abused its discretion, erred as a matter of law, held against the weight of the evidence, and failed to follow the Ohio child support guidelines, Ohio Rev. Code § 3113.215 et seq., and specifically, Ohio Rev. Code §§ 3113.215(B)(1), (B)(3), by improperly deviating downward from the amount that the father was required to pay to the mother for child support.
2. The trial court abused its discretion and erred as a matter of law in failing to require Joseph to pay pre-judgment and/or post-judgment interest on his unpaid child support obligations, which were to be paid to Janice, in the sum of $149,407.47.
 {¶ 15} A trial court has considerable discretion related to the calculation of child support, and, absent an abuse of discretion, an appellate court will not disturb a child support order. Pauly v. Pauly
(1997), 80 Ohio St.3d 386, 390, 686 N.E.2d 1108. An abuse of discretion is "more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.
 {¶ 16} We begin with the Father's appeal. In support of his first assignment of error, the Father argues that the magistrate should have calculated the guideline child support amount pursuant to R.C. 3119.04, which became effective on March 22, 2001. This statute changed the way in which courts are required to calculate guideline child support in cases, such as the present one, involving a combined gross income exceeding $150,000 per year. Formerly, courts calculated child support in such cases pursuant to R.C. 3113.215, which was repealed effective March 22, 2001. Essentially, the Father argues that the magistrate should have utilized the statute that was in effect at the time of the final hearing (June 7, 2002), instead of the statute that was in effect at the time of the filing of the action (February 21, 1996). For the following reasons, this argument is not well-taken.
 {¶ 17} Section 1.48 of the Ohio Revised Code establishes a presumption that a statute is to be applied prospectively unless the General Assembly expressly makes the statute retroactive. In order for a statute to be applied retroactively — that is, applied to cases filed before its effective date — a court must find that the General Assembly intended the statute to apply retroactively and that retroactive application of the statute is constitutional under Section 28, Article II of the Ohio Constitution. Warren Cty. Bd. of Commrs. v. Lebanon (1989),43 Ohio St.3d 188, 189, 540 N.E.2d 242. Because there is no language in the statute that supports the conclusion that the General Assembly intended R.C. 3119.04 to apply retroactively, we conclude that it applies prospectively, only to parentage actions filed after its effective date, March 22, 2001. See Schulte v. Schulte (1994), 71 Ohio St.3d 41, 45,641 N.E.2d 719.
 {¶ 18} The present parentage action, which included a request for child support, was filed on February 21, 1996, long before the effective date of R.C. 3119.04. Accordingly, the trial court correctly concluded that R.C. 3113.215, and not R.C. 3119.04, governed its calculation of child support in this case. The Father's first assignment of error is, therefore, overruled.
 {¶ 19} In support of his second assignment of error, the Father argues that the trial court erred in failing to impute income to the Mother for the year 1996, during which she reported no income but for which she claimed she incurred childcare expenses. Though the record reveals no evidence to support this fact, the parties appear to agree that the Mother was a full-time student throughout the year 1996.
 {¶ 20} Pursuant to former R.C. 3113.215(A)(1)(b), "income," for purposes of calculating child support "for a parent who is unemployed or underemployed, [means] the sum of the gross income of the parent, and any potential income of the parent." For a parent that the court determines is voluntarily unemployed or voluntarily underemployed, "potential income" means, inter alia, "[i]mputed income that the court * * * determines the parent would have earned if fully employed as determined from the parent's employment potential and probable earnings based on the parent's recent work history, the parent's occupational qualifications, and the prevailing job opportunities and salary levels in the community in which the parent resides." Former R.C. 3113.215(A)(5).
 {¶ 21} The trial court's decision regarding the imputing of potential income will not be reversed absent an abuse of discretion. Rock v.Cabral (1993), 67 Ohio St.3d 108, 616 N.E.2d 218, at syllabus; Harmon v.Harmon (Sept. 19, 1996), 10th Dist. No. 96 APF02-183. When a parent quits full-time employment to attend school, the trial court is not automatically required to impute income to that person for purposes of calculating child support. Harmon, supra, citing In the Matter of theCustody of Bischoff (Aug. 10, 1994), 3rd Dist. No. 14-94-4. Moreover, a trial court does not abuse its discretion in failing to impute income to a parent when the other parent introduces no evidence of the unemployed parent's occupational qualifications, or the prevailing job opportunities and salary levels in his or her community. Harmon, supra. See, also,Victoria L. v. Bruce L.M. (Dec. 30, 1994), 6th Dist. No. E-94-08; Frankev. Franke (May 1, 1996), 4th Dist. No. 95-CA-879; Dixon v. Dixon (Mar. 9, 1995), 8th Dist. No. 66997.
 {¶ 22} In the present case, though the record contains no evidence to establish that the Mother indeed attended school on a full-time basis in 1996, the record is also wholly devoid of evidence establishing her occupational qualifications, or the prevailing job opportunities and salary levels in her community. As such, the trial court did not abuse its discretion in failing to impute income to the Mother for the year 1996, for purposes of calculating guideline child support. Accordingly, the Father's second assignment of error is overruled.
 {¶ 23} In his third and final assignment of error, the Father argues that the trial court erred in failing to include as part of the Mother's income, for child support purposes, any tax refund amounts that the Mother received as a result of having taken advantage of the federal Earned Income Credit ("EIC").
 {¶ 24} Helpful to our review of this assignment of error is a brief look at how the EIC functions. The EIC is a dollar-for-dollar credit that reduces a person's tax liability because it is treated as a "payment" of tax and subtracted, like other "payments," such as withholding, from the taxpayer's liability under that year's tax tables. Thus, it can, in some cases, reduce a person's tax liability to a number below zero. "Unlike certain other credits, which can be used only to offset tax that would otherwise be owed [in other words, credits that cannot take one's tax liability below zero], the earned-income credit is `refundable.' Thus, if an individual's earned-income credit exceeds his tax liability, the excess amount is `considered an overpayment' of tax * * * [.] * * * An individual who is entitled to an earned-income credit that exceeds the amount of tax he owes thereby receives the difference as if he had overpaid his tax in that amount." Sorenson v. Secretary of Treasury
(1986), 475 U.S. 851, 854-855, 106 S.Ct. 1600, 89 L.Ed.2d 855.
 {¶ 25} This excess is issued and treated as a "refund," even though it is not actually a refund of overpaid income taxes. Thus, utilization of the EIC can, as it did in the Mother's case, result in what is, for all practical purposes, receipt of a gratuitous payment for working taxpayers who earn below a certain amount. In the present case, the Mother received, for tax years 1995 and 1997, tax refunds that included a portion that was attributable to her having claimed eligibility for the EIC. The Father argues that it is unfair and unlawful for the Mother to receive the EIC credit as a cash refund without such amount being included in her income for child support purposes.
 {¶ 26} Former R.C. 3113.215(A)(1) provided, "`Income' means either of the following: (a) [f]or a parent who is employed to full capacity, the gross income of the parent; (b) [f]or a parent who is unemployed or underemployed, the sum of the gross income of the parent, and any potential income of the parent." The same statute provided, "`Gross income'" does not include any benefits received from means-tested publicassistance programs, including, but not limited to, aid to families with dependent children, supplemental security income, food stamps, or disability assistance, * * *." Former R.C. 3113.215(A)(2). (Emphasis added.) The Mother argues, and the trial court agreed, that the EIC is a means-tested public assistance program and thus, any EIC credit received as an income tax refund does not constitute "income" for purposes of calculating child support.
 {¶ 27} Neither former R.C. 3113.215(A)(2), nor its successor, R.C.3119.01(C)(7)(a), defines the term "means-tested public assistance program." Words not defined in a statute must be afforded their common and ordinary meaning. Kimble v. Kimble, 97 Ohio St.3d 424, 2002-Ohio-6667,780 N.E.2d 273, at ¶ 6. Moreover, in examining a statute, a court cannot "delete any words or insert words not used." Lesnau v. AndateEnterprises, Inc. (2001), 93 Ohio St.3d 467, 471, 756 N.E.2d 97, citingState v. Jordan (2000), 89 Ohio St.3d 488, 492, 733 N.E.2d 601. In addition to the language of a statute, courts may glean intent by looking at the statute's purpose. Family Medicine Foundation, Inc. v. Bright,96 Ohio St.3d 183, 2002-Ohio-4034, 772 N.E.2d 1177, at ¶ 9, citing R.C.1.49.
 {¶ 28} The United States Court of Appeals for the Seventh Circuit has explained the meaning and operation of "means-tested" programs thusly:
Means-tested public assistance programs place a tax on earnings. Not a direct tax, after the fashion of the Internal Revenue Code, but an indirect one. Greater earnings yield less assistance. This is what it means to say that a program is means-tested, with benefits concentrated on persons with lower incomes or wealth.
Vaughn v. Sullivan (C.A.7, 1996), 83 F.3d 907, 908. (Emphasis added.)
 {¶ 29} In the legislative history of the Welfare Reform Act, "Federal means-tested public benefit" is defined as "a public benefit (including cash, medical, housing, and food assistance and social services) of the Federal Government in which the eligibility of an individual, household, or family eligibility unit for benefits, or the amount of such benefits, or both are determined on the basis of income, resources, or financial need of the individual, household, or unit." H.R. Conf. Rep. No. 104-725, at 381 (1996), reprinted in 1996 U.S.C.C.A.N. 2649, 2769.
 {¶ 30} The EIC is a tax credit available to certain people who work and whose adjusted gross income is less than a scheduled amount. See United States Dept. of the Treasury, Internal Revenue Service Pub. No. 596, at 1. Credits are figured using the EIC Table, which changes each year. Within the EIC Table, recipients' adjusted gross income is divided into 50-dollar increments up to a certain amount. Within any given increment, the recipient's credit increases if the person or married couple has a qualifying child, and further increases if the person or couple has two qualifying children. Id. at Appendix, 42-47. The amount of the credit steadily increases to a certain point as income increases, and then slowly decreases as income approaches that year's phaseout amount. Ibid. Once an individual's or married couple's adjusted gross income reaches or exceeds the phaseout amount, the credit is no longer available. The EIC is clearly a benefit wherein eligibility and the amount of benefits are determined based upon income. After a certain threshold is reached, the EIC yields fewer and fewer benefits as recipients enjoy greater earnings. Based upon these features, we find that the EIC is means-tested.
 {¶ 31} The second portion of the Mother's proposed test for exclusion from gross income requires resolution of the question whether the EIC is a "public assistance program." The United States Congress, the same legislative body responsible for the enactment of the EIC, consistently excludes refunds of EIC credit from definitions of "income." For instance, in defining "income" for purposes of determining eligibility for Supplemental Security Income benefits for the aged, blind, and disabled, Congress specifically excluded from the income of an individual applicant for benefits any refund made to the applicant or the applicant's spouse based on claiming of the EIC, and any payment made to such persons as an advance payment of EIC. See 42 U.S.C. § 1382a (b)(19).
 {¶ 32} Likewise, Congress has excluded all tax refunds from the definition of "income," for purposes of calculating household income in connection with determining eligibility for the federal food stamp program. See 7 U.S.C. § 2014(d)(8). Moreover, the statute that establishes the EIC, 26 U.S.C. § 32, expressly provides that, for purposes of the United States Housing Act of 1937, title V of the Housing Act of 1949, section 101 of the Housing and Urban Development Act of 1965, certain sections of the National Housing Act, and for purposes of the Food Stamp Act of 1977, "any refund made to an individual (or the spouse of an individual) by reason of this section, and any [advance EIC] payment made to such individual (or such spouse) by an employer * * * shall not be treated as income (and shall not be taken into account in determining resources for the month of its receipt and the following month.)" Id. at paragraph (1). The foregoing observations lend support to the Mother's position that her EIC-related refund amounts should not be included in her income for purposes of calculating child support.
 {¶ 33} However, the legislative goals underlying the foregoing federal statutes are patently and fundamentally different from those underlying Ohio's child support legislation. It is clear that Congress intended that disadvantaged or otherwise economically fragile individuals who need housing, food or other assistance will not be rendered ineligible for programs providing such assistance by virtue of having taken advantage of the EIC, which itself is designed to assist needy individuals in moving from welfare to work, or in continuing to work and avoid having to seek aid through Temporary Aid to Needy Families ("TANF").[1] Thus, those individuals who seek to offset the tax consequences of choosing work over TANF, by claiming a credit under the EIC, will not do so at the risk of rendering themselves ineligible for further assistance in meeting the housing and nutritional needs of their families. In excluding EIC refunds from income in the foregoing statutes, Congress has achieved the harmonization of two related and mutually beneficial legislative policy goals.
 {¶ 34} The underlying purpose of Ohio's child support legislation, on the other hand, is to meet the current needs of the minor child. Park v.Ambrose (1993), 85 Ohio App.3d 179, 183, 619 N.E.2d 469, fn. 1., jurisdictional motion overruled (1993), 67 Ohio St.3d 1409,615 N.E.2d 1043. The state has a public policy interest in parents fulfilling their obligation to provide support for their children. Statev. Pyo, 7th Dist. No. 04CAA01009, 2004-Ohio-4768, at ¶ 15. This policy is not undermined, and, in some instances, may be promoted by inclusion within a parent's income, for child support purposes, of the portion of that parent's income tax refund that results from the parent having taken advantage of the EIC. Such inclusion appears to be even more congruent with the purposes of the EIC upon consideration of the fact that the amount of the EIC credit that a taxpayer enjoys increases with the number of qualifying children of the taxpayer. In other words, the benefits realized from the EIC are directly proportional to the number of children being cared for by the individual taxpayer. See 26 U.S.C. § 32(b).
 {¶ 35} Accordingly, inclusion within a parent's income for child support purposes, of the EIC-attributable portions of that parent's tax refunds, would not offend Congressional intent that the EIC serve to promote and reward work within low-income families with children. We perceive no antagonism between the equally laudable goals of relieving the working poor of some or their entire income tax burden so as to encourage work, and that of reinforcing the obligation of all parents to utilize the fruits of their daily labors to provide support for their children.
 {¶ 36} Having examined these legislative intent- and policy-related questions, we now turn to other established means of divining the proper meaning of an undefined term used in a statute; in this case, the term "public assistance program." The rule of noscitur a sociis, "it is known from its associates," aids us in this endeavor. "The rule follows from the premise that `the coupling of words denotes an intention that they should be understood in the same general sense.'" Wilson v. Stark CountyDept. of Human Servs. (1994), 70 Ohio St.3d 450, 453, 639 N.E.2d 105, quoting 2A Sutherland Statutory Construction (5 Ed. Singer Rev. 1992) 183, Section 47.16. The non-exhaustive list of public assistance programs excluded from a parent's income by virtue of former R.C. 3113.215(A)(2), includes programs that provide tangible and specific goods and services, such as food vouchers, assistance for persons with disabilities, and cash entitlement payments for those with insufficient or nonexistent other sources of income. These programs thus differ from the EIC in that the EIC, though means-tested, requires that the recipient be working, and contains no prescriptions or guidelines as to the specific use to be made of any refundable credits, e.g., food, disability-related supplies or services, health care, etc.
 {¶ 37} The term "assistance" is defined in the Ohio Administrative Code. In the exercise of its rulemaking authority under R.C. Chapter 119, the Ohio Department of Job and Family Services has promulgated rules relating to its administration of the TANF program. In so doing, it has adopted some of the definitions contained in federal regulations related to that program. These definitions are found at Ohio Adm. Code 5101:1-1-01. Therein, "assistance" is defined, in part, as "cash, payments, vouchers, and other forms of benefits designed to meet a family's ongoing basic needs for food, clothing, shelter, utilities, household goods, personal care items and general incidental items." Ohio Adm. Code 5101:1-1-01(B)(1). Specifically excluded from the definition of "assistance" are, among six other enumerated items, "[r]efundable earned income tax credits." See, also, 45 CFR 260.31.
 {¶ 38} Thus, the EIC is specifically distinguished, by federal regulation and by this state's administrative code, from TANF and similar public assistance programs akin to the former "welfare" programs of the past, which were characterized by cash entitlement payments of indefinite duration to non-working individuals. This distinction lends further support to the Father's contention that the EIC is not the type of means-tested program that the General Assembly intended to exclude from the income of its recipients when such income is used to calculate child support.
 {¶ 39} We also find noteworthy the fact that Congress does not consider the EIC to be a "means-tested public assistance program." Congress has limited the meaning of the term "means-tested welfare or public assistance program for which Federal funds are appropriated" to include only three programs: (1) the food stamp program, under the Food Stamp Act of 1977, 7 U.S.C. § 2011 et seq.; (2) any program of public or assisted housing under title I of the Housing Act of 1937,42 U.S.C. § 1437, et seq.; and (3) any state program funded under part A of Title IV of 42 U.S.C. § 601, et seq., which provides for block grants to states to administer TANF. See 42 U.S.C. § 608a.[2]
 {¶ 40} When Congress had the opportunity to include the EIC in this exhaustive list of programs meeting the definition of "means-tested welfare or public assistance program," it chose not to do so. This, too, favors the viewpoint that while the EIC is means-tested, it is substantially unlike the more general public assistance programs that provide tangible goods and services, such as food, housing, or direct cash payments. As we discussed earlier herein, the EIC is intended, in significant part, to aid low-income workers with dependent children in providing for the care of such children; thus, its inclusion within a parent's income for purposes of child support calculation does not frustrate, and may often further, this goal.
 {¶ 41} Therefore, we find that any portion of a tax refund received as a result of a parent having taken advantage of the EIC should be included in a parent's gross income for purposes of calculating child support under former R.C. 3113.215(A)(1). Though the EIC is means-tested, we hold that it is not the type of "public assistance program" the benefits of which the General Assembly intended to exclude from a trial court's consideration of the income a parent has available to fulfill his or her obligation to support that parent's child. Thus, we agree that the trial court should have included within the Mother's income for child support purposes, any portion of her tax refunds attributable to the EIC.[3]
Accordingly, the Father's third assignment of error is sustained.
 {¶ 42} We now turn to the cross-appeal, in which the Mother asserts two assignments of error.
 {¶ 43} In support of her first assignment of error, she argues that the trial court erred in deviating downward from the guideline child support amount. More specifically, she argues that the court improperly granted a $1,000-per-month deviation when the Father actually spent far less than this amount in exercising his monthly visitation with Anna. She also argues that the court placed undue emphasis on the Father's visitationrelated expenses and, as a result, did not adequately consider all of the factors it was required to consider, pursuant to former R.C.3113.215(B)(3)(a) through (p).
 {¶ 44} We cannot say that it is never appropriate to order a deviation in child support based primarily upon one parent's visitation-related financial burden, so long as all relevant factors are considered, pursuant to former R.C. 3113.215(B)(3), now R.C. 3119.23. However, in the present case, we must sustain the Mother's first assignment of error and reverse the child support order because, after a copious review of the record, we find no evidence therein to support the trial court's deviation. Though it contains frequent references to the Father's right to exercise out-of-state visitation with Anna, the record is devoid of any evidence as to whether the Father ever visited Anna in North Carolina or flew her to Ohio, let alone how many times this occurred. Likewise, there is absolutely no evidence of record as to how much money the Father actually spent in exercising visitation with Anna. It appears that the trial court arbitrarily accepted an assumption made by the magistrate, and consequently failed to support the deviation with evidence-based findings of fact. See Junke v. Junke (June 10, 1993), 8th Dist. No. 62461.
 {¶ 45} The dearth of evidence in the record to support the trial court's downward deviation in child support results in an unacceptable failure to comply with the requirements of R.C. 3113.215, and requires reversal. In the case of Marker v. Grimm (1992), 65 Ohio St.3d 139,601 N.E.2d 496, the Supreme Court of Ohio held, "[t]he terms of [former] R.C. 3113.215 are mandatory in nature and must be followed literally and technically in all material respects," and "[a]ny court-ordered deviation from the applicable worksheet and the basic child support schedule must be entered by the court in its journal and must include findings of fact to support such determination." Id. at paragraphs 2-3 of the syllabus.Marker mandates reversal when no factual basis exists in the record to support the deviation. Junke, supra. Accordingly, the Mother's first assignment of error is sustained.
 {¶ 46} The Mother's first argument in support of her second assignment of error consists in the proposition that the trial court should have awarded her prospective interest on the court's March 5, 2004 judgment with respect to the Father's unpaid child support obligation. She argues that, pursuant to the version of R.C. 1343.03(A) that was in effect on the date of the court's entry, she is entitled to interest on the $149,407.47 judgment, commencing on the date of judgment and accruing until the judgment is paid in full. We agree.
 {¶ 47} Former R.C. 1343.03(A) provided, in pertinent part, "* * * when money becomes due and payable upon * * * all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate of ten percent per annum * * *." In the case of Dunbar v. Dunbar (1994), 68 Ohio St.3d 369, 627 N.E.2d 532, the Supreme Court of Ohio held that, "any unpaid and delinquent installments [of child support] must be reduced to a lump-sum judgment before an execution can be levied upon the monies owing." Id. at 370. The Dunbar
court also held that child support arrearages that have not been reduced to a lump-sum judgment are not subject to the interest provisions of R.C. 1343.03. Id. at syllabus. Thus, the court implicitly held that child support arrearages that have been reduced to a lump-sum judgment, since they are at that point susceptible of execution and levying, are subject to the interest provisions of R.C. 1343.03, though that statute does not specifically mention child support arrearage judgments. See Clymer v.Clymer (Sept. 21, 2000), 10th Dist. No. 99AP-924.
 {¶ 48} Accordingly, when a trial court orders a definite sum to be paid as and for child support found to be in arrears, as the trial court did in the present case, such payment is due and payable at the time of the judgment and is subject to the interest provisions of R.C. 1343.03. In the present case, it was error for the trial court to not grant the Mother the statutory interest rate on the March 5, 2004 judgment.Clymer, supra.
 {¶ 49} In the Mother's second argument in support of her second assignment of error, she calls our attention to the fact that part of the magistrate's decision adopted by the trial court provides that "Defendant's child support obligation from July 18, 1998 through December 31, 2001 is determined to be $149,407.47." The Mother argues that the court should have made a finding that the Father's default with respect to this unpaid sum was willful, pursuant to R.C. 3123.17(A), and should thus have assessed interest on the arrearage amount from the date of the default to the date of the trial court's March 5, 2004 order. The Father argues that, because the March 5, 2004 judgment entry was the first court "order" determining the permanent child support amount, the court was under no obligation to determine whether the Father was in default of any prior support order, or whether such default was willful.
 {¶ 50} Section 3123.17(A) provides:
When a court issues or modifies a court support order, the court shall determine the following:
(1) Whether the obligor is in default under a prior court support order or the court support order being modified;
(2) If the obligor is in default, the date the court support order went into default and the amount of support arrearages owed pursuant to the default.
If the court determines the obligor is in default under a support order, the court shall issue a new order requiring the obligor to pay support. If the court determines the default was willful, the court may assess interest on the arrearage amount from the date the court specifies as the date of default to the date the court issues the new order requiring the payment of support and, if interest is assessed, shall compute the interest at the rate specified in section 1343.03 of the Revised Code. The court shall specify in the support order the amount of interest the court assessed against the obligor, if any, and incorporate the amount of interest into the new monthly payment plan.
 {¶ 51} Pursuant to R.C. 3123.171, "[n]otwithstanding section 1343.03
of the Revised Code, interest may be charged on the amount of support arrearages owed pursuant to a default under a child support order only as provided by section 3123.17 of the Revised Code." Thus, R.C. 3123.17 is the only statute upon which the Mother may premise entitlement to interest on unpaid child support with an accrual commencement date earlier than March 5, 2004.
 {¶ 52} The parties' arguments with respect to this issue reveal one basic and fundamental disagreement. The Mother argues that the court's October 6, 1999 temporary orders, which ordered the Father to pay temporary child support on an ongoing basis in the amount of $2,000 per month, constitute a "prior court support order" of which the Father was in default, requiring a determination under R.C. 3123.17(A) whether the Father's default was willful. On the other hand, the Father argues that the October 6, 1999 temporary orders do not constitute a "prior court support order" for purposes of R.C. 3123.17(A) because the $2,000-per-month figure in the temporary orders was later amended in the magistrate's decision rendered November 18, 2002, and adopted by the trial court on March 4, 2005. He argues that, because the March 5, 2004 judgment entry was the first time that the trial court issued a final order respecting monthly child support due for the time period from October 6, 1999 through December 31, 2001, the trial court correctly declined to inquire whether the Father was "in default" of the temporary orders.
 {¶ 53} As used in R.C. Chapter 3123, "court support order" means, inter alia, "a court child support order." "Court child support order" means any order issued by a court for the support of a child pursuant to * * * section * * * 2153.23 * * * of the Revised Code." Section 2153.23 confers jurisdiction in the court of common pleas, to determine an application for an order of support of a minor child in a parentage action. Rule 13 of the Ohio Rules of Juvenile Procedure permits a court to make temporary orders with respect to the care and support of a child subject of the complaint.
 {¶ 54} It is thus clear that a court's temporary orders in a parentage proceeding, ordering that one parent pay child support to another for the benefit of the minor child subject of the complaint, pending the court's final judgment entry, constitute a "court support order" within the meaning of R.C. 3123.17(A). Accordingly, whenever a court "issues or modifies" such an order the court must make the determinations required by R.C. 3123.17(A).
 {¶ 55} When the trial court, through its March 5, 2004 judgment entry, modified the October 6, 1999 temporary orders regarding the Father's support obligation with respect to the time period covered by the October 6, 1999 temporary orders and encompassed within the court's aggregate arrearage figure of $149,407.47, the court was required to determine whether the Father was in default under the temporary orders, and if it determined that he was in default as to any required payment, whether such default was willful. That the court failed to do so was error.
 {¶ 56} It appears from the language of the magistrate's decision that the Father was in default for at least part of the sums encompassed within the final aggregate arrearage figure. Immediately following the magistrate's finding that the Father's child support obligation for the period of July 18, 1998 through December 31, 2001 was $149,407.47, the magistrate stated, "Defendant shall receive a credit against said obligation for all temporary child support he paid herein." Thus, it appears that, as of the date of the hearing before the magistrate, the Father had paid some, but not all of the child support previously ordered. Therefore, the court should have made findings as to the precise amount of child support that remained unpaid under the court's temporary orders, and should have proceeded with the other determinations required by R.C. 3123.17(A). In consideration of all of the foregoing, the Mother's second assignment of error is sustained.
 {¶ 57} The Father's first and second assignments of error are overruled, the Father's third assignment of error is sustained, and the Mother's first and second assignments of error are sustained. The judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is reversed and remanded to that court for further proceedings consistent with this opinion.
Judgment reversed and remanded.
Lazarus and French, JJ., concur.
[1] TANF replaced the former Aid to Families with Dependent Children ("AFDC") when Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 and the Welfare Reform Act of 1996. Jennifer E. Spreng, When "Welfare" Becomes "Work Support":Exempting Earned Income Tax Credit Payments in Consumer Bankruptcy, 78 Am.Bankr.L.J. 279, 298-299 (2004). See, also, Ohio Legislative Service Comm. Members Only Brief, An Overview of Federal Welfare Reform: TheTemporary Assistance For Needy Families And Medicaid Programs, Vol. 122, Issue 3 (Mar. 7, 1997).
[2] This paragraph provides, "[i]f an individual's benefits under a Federal, State, or local law relating to a means-tested welfare or a public assistance program are reduced because of an act of fraud by the individual under the law or program, the individual may not, for the duration of the reduction, receive an increased benefit under any other means-tested welfare or public assistance program for which Federal funds are appropriated as a result of a decrease in the income of the individual (determined under the applicable program) attributable to such reduction.
[3]

 1995
 Total Withheld (Line 29a) 297.78
 Total Tax (Line 28) — 0
 ______
 Overpayment of Tax 297.78 (Not Included in Income)
 EIC Credit (Line 29c) +2,094.00 (Included in Income)
 ________
 Total Refund Received 2,391.78
 1997
 Total Withheld (Line 29a) 812.85
 Total Tax (Line 28) — 287.00
 Overpayment of Tax 525.85 (Not Included in Income)
 EIC Credit (Line 29c) +1,332.00 (Included in Income)
 ________
 Total Refund Received 1,857.85